Matter of 379 Hawthorne LLC v Hunter (2024 NY Slip Op 51451(U))

[*1]

Matter of 379 Hawthorne LLC v Hunter

2024 NY Slip Op 51451(U)

Decided on October 23, 2024

Supreme Court, Kings County

Maslow, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 23, 2024
Supreme Court, Kings County

In the Matter of the Application of 379 Hawthorne LLC, Petitioner,

against
Michelle Hunter and MICHAEL PESCA, Respondents, 
 for an order and judgment pursuant to Real Property Actions and Proceedings Law § 881. 

Index No. 516255/2024

Kane Law PC, New York City (Rachelle Rosenberg of counsel), for petitioner.
Mintz & Gold, New York City (James W. Kennedy of counsel), for respondents.

Aaron D. Maslow, J.

The following numbered papers were used on this special proceeding: NYSCEF Document Numbers 1-51.
Upon the foregoing papers, having heard oral argument virtually via Teams, and due deliberation having been had, the within special proceeding is determined as follows.
Through a signed order to show cause and petition, Petitioner 379 HAWTHORNE LLC has commenced a special proceeding pursuant to Real Property Actions and Proceedings Law (RPAPL) § 881, seeking a court-ordered license to enter upon Respondents' attached property known as 383 Hawthorne Street, Brooklyn, New York, to install, inspect, maintain, and remove certain protections and scaffolding for the period in which construction is to take place at 379 Hawthorne Street, Brooklyn, New York; awarding it attorney's fees and costs; and granting such other relief as the Court may deem just and proper.
Petitioner is the owner of the property located at 379 Hawthorne Street, Brooklyn, New [*2]York, and has an office located at 11 Lawrence Avenue, Brooklyn, New York. Respondents MICHELLE HUNTER and MICHAEL PESCA own and reside at the adjacent property of 383 Hawthorne Street, Brooklyn, New York. The properties are situated on a block of old attached homes. The purpose of the requested access by Petitioner to Respondents' property is to be able to install certain improvements to Petitioner's property, specifically erecting a new five-story, nine-unit residential building. Respondents have not granted Petitioner access to their property so that Petitioner can proceed with its building plans.
Petitioner alleges, among other things, that a site safety plan for the temporary overhead and roof protection of Respondents' home was drafted by a state licensed engineer; that Petitioner seeks to conduct a pre-construction survey of Respondents' premises, place remote access vibration monitors in Respondents' premises if required by Code, install crack gauges and survey marks on Respondents' home if required by Code, install rooftop protections on Respondents' home, install "shed style" overhead protection on the required ground areas of Respondents' property for pedestrian protection and construction scaffolding upon certain shed areas for installing weatherproofing on Petitioner's building to be constructed, and use hanging scaffolding for any work over Respondents' roof; that Petitioner procured commercial general liability insurance for the Respondents' home in an amount of $1,000,000.00 per occurrence, $2,000,000.00 in the aggregate, and approximately $5,000,000.00 of excess/umbrella coverage and will maintain said insurance coverage until the completion of the work; that if access to Respondents' property is denied, Petitioner will suffer significant financial detriment with the diminution in value of its property; that the inconvenience to Respondents' property would be minimal; and that Petitioner will clean up any dust, dirt, or debris that accumulates on Respondents' home or elsewhere on a daily basis (see generally NYSCEF Doc No. 1, petition).
Petitioner seeks additionally that the court-ordered license, among other things, grant Petitioner the right to immediately access Respondents' property at any time when Petitioner reasonably believes that the health, safety and/or welfare of any person is in immediate harm or jeopardy or to prevent material damage to either of the properties; compel Respondents to execute any documents confirming its consent to the work; prohibit Respondents from unreasonably or improperly interfering with the work being performed; prohibit Respondents from filing a complaint with the Department of Buildings about the work being performed without first notifying Petitioner and permitting it reasonable time to correct Respondents' concerns; permit Petitioner to utilize law enforcement to enter Respondents' home; and provide for a license fee to Respondents of $2,000 per month initially, $2,500 per month for months 13-18, and $3,000 per month thereafter (see generally NYSCEF Doc No. 8, license).
Among the claims made by Petitioner, through Shalom Stahler, its operations manager, are that it purchased the 383 Hawthorne Street property with the intention of demolishing the two-story home that was situated there and erecting a five-story multi-unit residential building. He was advised by his architect that notice of construction to neighbors was not required. Demolition was completed in April 2024, and protection for Respondents' property was not required. Several drafts of a licensing agreement with Respondents have been exchanged but the parties are at an impasse. It was unreasonable for Respondents to demand that Petitioner pay compensation so that Michael Pesca could rent a recording studio for his podcasts. It was excessive for Respondents to demand $50,000 in escrow when there would be $6,000,000 in insurance covering a home worth less than $1,700,000. Respondents' unreasonableness was evidenced by their stirring up the neighborhood against the construction project and calling 311 [*3]to complaint about it. Michelle Hunter Pesca even physically obstructed operations when she stood under Petitioner's concrete truck chute. (See NYSCEF Doc No. 2, Shalom Stahler aff ¶¶ 7-19.)
Notably, Petitioner alleges further that "On April 4, 2024, the Parties conducted a pre-construction survey for which the report by Quiver League shall serve as prima facie evidence of the Adjacent Property's condition at that time" (NYSCEF Doc No. 8, license at PDF 2).
Petitioner's application for a court-ordered license to enter upon Respondents' property is vigorously opposed by Respondents, husband and wife owners of 383 Hawthorne Street. Respondent Michelle Hunter Pesca submitted an affirmation in opposition, which is included in the record as NYSCEF Doc No. 22. In it she avers that Petitioner engaged in the following conduct: began its construction on March 29, 2024, when it partially demolished the then situated, adjacent house at 379 Hawthorne Street. She stated, among other things, that Petitioner began demolition without prior notice, posted permits, and a pre-construction survey of their property at 383 Hawthorne Street; demolished a brick knee-wall and metal fence partially located on their property, without permission or notice, and repeatedly otherwise trespassed on their property; installed crack monitors on their property at their request, but failed to remove the "pin" so that the monitors did not measure the increasing damage caused; failed to install vibration monitors on its own property, which were required by their approved plans and was requested several times by Respondents and their structural engineer; delayed unreasonably in providing plans for review by Respondents' structural engineer; installed flashing on their roof without permission or prior notice; caused cracks on floors and ceilings in over 30 locations in Respondents' home; caused bricks to fall from their building facade and failed to repair their crumbling chimneys, causing water damage inside their home; failed to station a supervisor or safety supervisor on the construction site for the first week of construction, when the majority of damage occurred to their home; failed to install a demolition chute, as required by approved safety plans, and netting while repeatedly throwing debris from a second-floor window into a truck below, with boards having protruding nails landing on their property; caused work to take place outside of normal hours, without variances or permits, causing disruption to the neighborhood; and repeatedly blocked pedestrian and vehicular traffic, including an ambulance, after hours to pour concrete, jeopardizing the safety of residents and disrupting the neighborhood, all without the required variances or permits. (See NYSCEF Doc No. 22, Michelle Hunter Pesca aff ¶¶ 2-3.)
Respondents called 311 to report the Petitioner to the Department of Buildings, resulting in violation notices being issued. Petitioner threatened to turn its property into a homeless shelter.[FN1]
Respondent Michael Pesca's recording of a podcast, called The Gist, was interrupted by [*4]the construction; he records throughout the day at various times based on the schedules of his guests. The parties were unable to resolve their differences through negotiations. In particular there was an impasse over paying Mr. Pesca to rent a studio from which he could record his podcast episodes without the excessive construction noise; paying Respondents $50,000 in escrow to cover damage to their home already sustained; paying Respondents' transaction and litigation attorneys' and structural engineering fees; the procedure by which protective equipment would be installed; and performing a proper, rather than an incomplete, pre-construction survey of their home. (Id. ¶¶ 4-7, 9-10.)
Respondents submitted photos of what they claim were cracks, water damage resulting from the next-door construction, and Petitioner's transgressions, including demolishing a brick knee wall and metal fence partially located on Respondents' property, removing brick pillars, trespassing onto their property to relocate a planter and to access their driveway, erecting a construction fence five inches onto their property, and pouring Petitioner's new foundation cement five inches onto their property (id. ¶ 18; see NYSCEF Doc Nos. 29-30, 36-37 photos). Respondents submitted into the record the April 4, 2024 pre-construction survey of Quiver League, retained by Petitioner, which survey found cracks on Respondents' property. The survey was described as insufficient because it did not note other conditions and it misdescribed the composition of the walls. (See NYSCEF Doc No. 22, Michelle Hunter Pesca aff ¶¶ 26-28.)
An exhaustive list of damage to Respondents' home was submitted as NYSCEF Doc No. 38:
Exterior
• Removal of brick knee wall, pillars, and fence partially on 383 property (refer to 383 survey)
• Damage to front entry gate - separation of metal from brick pillar
• Cracks / damage / loose concrete at driveway in multiple locations where driveway was cut
• Large hole in concrete next to entry stairs (approx. 28" x 5")
• Installation of construction fence over 383 property line. Fence has subsequently shifted further onto property due to concrete foundation pour applying lateral force against plywood from 379 side.
• Multiple cracks at stoop side walls
• Multiple cracks underneath stoop
• Loosened stone at bottom step
• Stucco finish below stairs cracked and loose
• Separation of Cellar entry door frame from foundation wall
• Horizontal loss of mortar at red brick near Cellar gate
• Large vertical crack along mortar of front facade from ground to top of first floor
• Loss of brick in numerous locations along 3 front windows
• Concrete seepage underneath fence onto driveway
• Insulation installed on 383 property at fence line
• Cracks at foundation at rear yard
• Cracks at rear facade brick
• Loosened brick at rear 2nd floor window
• 2 crumbling chimneys along party wall on 379 side, causing water infiltration in Recording Studio and Front Office
• Installation of vapor barrier with tar on roof
Cellar Level
• Cracks at Entry door casing
• Cracks at front windows
• Cracks at wall locations
Ground Floor
• Extensive crack where Living Room interior wall meets front exterior wall
• Buckling to plaster at party wall
• Cracks at Kitchen ceiling and plaster cove moulding
2nd Floor
• Cracks / water infiltration along party wall in Stair Hall - where party wall meets ceiling and skylight
• Long crack along stair stringer where it meets party wall
• Loose / buckling floorboard where top of stair meets 2nd Floor
• Crack / seam exposure in Stair Hall ceiling near Recording Studio entry
• Ceiling seam exposure in Recording Studio ceiling, due to water / moisture infiltration
• Large vertical crack in Kid's Bedroom where interior wall meet rear exterior wall
• Large angled crack in Front Office wall at door casing
• Large vertical crack in Front Office wall along entry door wall
• Water damage in Front Office wall and ceiling due to open chimney at roof
• (2) cracks in Primary Bedroom wall at (2) door casing locations
• Multiple large cracks in small Closet walls and ceiling
• Crack at large Closet wall door frame
• Multiple long cracks at large Closet walls and ceiling
• Cracks to ceiling around skylight in Bathroom
Respondents estimated that the cost to repair the conditions on their property caused so far by Petitioner's work ranges from $61,362 at the lowest to $103,212 at the highest (see NYSCEF Doc No. 39, estimates).
Respondent Michael Pesca also submitted an affirmation. He focused mostly on his employment as a journalist. He previously worked for NPR and WNYC Radio. His podcast, The Gist, employs several people, has been ongoing for 11 years, has won journalistic awards, and featured many notable guests. While Mr. Pesca equipped his home studio with special acoustic panels, it is not soundproof. Noise from the construction penetrated the studio and rendered the acoustics unwieldy and unprofessional. If the construction continues, the podcast will suffer, jeopardizing his livelihood and that of his employees. (See NYSCEF Doc No. 40, Michael Pesca aff ¶¶ 5-9.) Mr. Pesca asserted, among other things, the following:
My Need to Rent a Studio, Monthly, During Construction
11. It would be totally impractical — indeed, unworkable — for me simply to let the Developer know each day when I will be recording so that they can stop construction during those times. Because I am beholden to my interviewee's schedule, I record the interview, opinion pieces, and intro at different times daily. Often, my interview guests are located outside our state and in different time zones. My recording schedule is also subject to last minute changes, as my interview guests are busy individuals who cannot always be "locked in" to the agreed upon date and time for an interview.
12. I also have no reason to believe that the Developer could, as a practical matter, delay construction activities at various times throughout the week so that I can record my podcast without the intrusion of a major, ongoing construction next door. That would likely be a coordination nightmare for the Developer. I have no doubt that, like me, the Developer must accommodate the schedules of others, including contractors, delivery persons and inspectors.
13. Furthermore, for reasons that are more fully detailed in Michelle's accompanying Affirmation, I have legitimate concerns about the Developer's willingness to cooperate with me in relation to the scheduling or performance of its construction activities, especially given their history of working outside permitted hours of construction and their lack of respect for my working needs.
14. As early as December 14, 2023, Michelle forewarned the Developer via text (as they were engaged in pre-demolition boring) that "Mike needs to stop recording and reschedule until the drilling has stopped." Rather than stopping the drilling, the Developer replied that it "need[s] one more hour Max an hour and a half" and that testing would be "noisy for a few days." A true and correct copy of this text is attached hereto as Exhibit 1. Although the parties resolved that situation because we were gone from our home for a couple of days leading up to New Year's Eve, we will not have that kind of flexibility during the many months of noisy construction.
15. Michelle's affirmation describes at length the interference (and damage) caused once the Developer commenced demolition in early April 2024, before conducting a pre-construction survey and without providing our engineer with complete plans for the Project, including a geotechnical report. When Michele insisted via text that the demolition work cease "until the engineering review occurs and measures have been taken to protect our foundation, party wall and roof," the Developer took "all negotiations off the table", threatened to commence this legal proceeding and declared, "we will by putting in cityfeps/shelter tenants in this building when it's done. Good luck." Ex. 1. Frustrated, I replied via text that at least the Developer was being "consistent" in threatening to "punish us by putting in a shelter for [the] homeless" in response to our objections to their "violating rules." Id.
16. On April 4, 2024, a monitoring company entered upon our property without advance notice or permission, leading to a series of text exchanges in which Michelle wrote, "we cannot have these kind[s] of distractions every day. We have not been able to work." (Emphasis added). A true and correct copy of this text exchange is attached hereto as Exhibit 2. Once again frustrated, I added, "What in the world? We have no agreement. You can't do this. This is a clear violation." Id.
17. The noise and distractions caused by the Project continued thereafter for weeks, until the Developer abandoned the site in May. I have audio recordings of the noise, which I [*5]would be pleased to provide to the Court.
18. Even if the Developer tries in good faith to accommodate my work-from-home schedule, I cannot, as a practical matter, negotiate daily with them over scheduling while trying to prepare and set up for interviews; nor could I tolerate becoming embroiled in a disagreement with them over my need to meet my guests' schedules with their need simultaneously to engage in some aspect of the Project. And, having not invited the Project next door, there is no reason that I should cede the flexibility and professional work conditions provided to me by my home studio.
19. The only workable alternative is for me to rent a studio from which I can work during the Project. Although some local studios do rent time on an hourly basis, the monthly cost for a studio rental, would be most cost effective. Additionally, my recording schedule is irregular, so I could not rent a studio for the same hours each day. I also do all my work (including research, composition and coordination with my producers) from my studio. I simply do not have the luxury of working from home and then shuttling over to a rented studio for a one-hour interview, only then to return home, write my opinion segment, and return to the studio to record again. The only way I can be sure to have the studio time when needed is to book a studio monthly.
20. The best estimate I have received for local studio rentals is $3400 per month. A true and correct copy of this estimate is attached hereto as Exhibit 3. (NYSCEF Doc No. 40, Michael Pesca aff ¶¶ 11-20.)
Real Property Actions and Proceedings Law § 881 provides:
When an owner or lessee seeks to make improvements or repairs to real property so situated that such improvements or repairs cannot be made by the owner or lessee without entering the premises of an adjoining owner or his lessee, and permission so to enter has been refused, the owner or lessee seeking to make such improvements or repairs may commence a special proceeding for a license so to enter pursuant to article four of the civil practice law and rules. The petition and affidavits, if any, shall state the facts making such entry necessary and the date or dates on which entry is sought. Such license shall be granted by the court in an appropriate case upon such terms as justice requires. The licensee shall be liable to the adjoining owner or his lessee for actual damages occurring as a result of the entry.
The standard for evaluating an RPAPL § 881 application was recently stated as follows:
A proceeding pursuant to RPAPL 881 is addressed to the sound discretion of the court, which must apply a reasonableness standard in balancing the potential hardship to the applicant if the petition is not granted against the inconvenience to the adjoining owner if it is granted (see Matter of Queens Coll. Special Projects Fund, Inc. v Newman, 154 AD3d 943, 943-944 [2017]). The factors which the court may consider in determining the petition include the nature and extent of the requested access, the duration of the access, the needed protections for the adjoining property, the lack of an alternative means to perform the work, the public interest in the completion of the project, and the measures in place to ensure the financial compensation of the adjoining owner for any damage or inconvenience resulting from the intrusion (see id. at 944). (Matter of Queens Theater [*6]Owner, LLC v WR Universal, LLC, 192 AD3d 690, 690-691 [2d Dept 2021.)
In Matter of Queens Theater Owner, LLC,
the Supreme Court properly granted the petition pursuant to RPAPL 881 for a license to temporarily enter the appellant's property, since an assessment of the foregoing factors supported the petition. The affidavits of the petitioner's representative and two engineers retained for the project demonstrated that the limited access and placement of structures would protect the appellant's property and would not interfere with the use of the premises, and that the public interest would be served by the development of the project. Moreover, the appellant would be financially protected by the naming of the appellant as an additional insured on the relevant construction insurance policies and by the petitioner's obligation to indemnify the appellant for any loss (see id. at 944-945). Accordingly, the evidence supports the conclusion that the petitioner would suffer an undue hardship if the RPAPL 881 license were denied, whereas the appellant will experience temporary and relatively minor inconvenience as a result of the issuance of the license. (Id. at 691.)
Since "[t]he respondent to an 881 petition has not sought out the intrusion and does not derive any benefit from it . . . [e]quity requires that the owner compelled to grant access should not have to bear any costs resulting from the access" (DDG Warren LLC v Assouline Ritz 1, LLC, 138 AD3d 539, 540 [1st Dept 2016]). "A property owner compelled to grant a license should not be put in a position of either having to incur the costs of a design professional to ensure petitioner's work will not endanger his property, or having to grant access without being able to conduct a meaningful review of petitioner's plans" (Van Dorn Holdings, LLC v 152 W. 58th Owners Corp., 149 AD3d 518, 519 [1st Dept 2017], quoting Matter of North 7—8 Invs., LLC v Newgarden, 43 Misc 3d 623, 630 [Sup Ct, Kings County 2014] [internal quotation marks omitted]).
The information provided by the proposed licensee must be adequate and sufficiently specific to ensure protection of the respondents' interests (see Matter of Thomas Anthony Holdings LLC v Goodbody, 216 AD3d 538, 539-540 [1st Dept 2023]). However rather than dismissal, as in Goodbody, "the appropriate remedy was not to deny the petition outright, but to resolve those issues, as well as the appropriate conditions to protect respondents' interests and the amount of any license fee, following a hearing at which additional information, including the revised safety plan may be considered" (id.).
This Court notes that the within petition was not verified. Rather, the petition was comprised of unsworn statements from Petitioner's attorneys. Accompanying the petition was an affidavit from Shalom Stahler, operations manager for Petitioner. Mr. Stahler did not demonstrate any professional technical knowledge in order to vouch that the project's incursions and disturbances would be nothing more than "minor inconveniences[s]" to Respondents and would not endanger their premises (Matter of Queens Theater Owner, LLC, 192 AD3d at 691; see Van Dorn Holdings, LLC, 149 AD3d at 519). In fact, the unauthenticated site safety plan displays the word "PRELIMINARY" on all its pages (see NYSCEF Doc No. 6); it is not finalized. Mr. Stahler claimed that Petitioner was exempted from notifying the neighbors of construction based on the demolition's and foundation pouring's technical details, relying on [*7]hearsay from "my Architect" (NYSCEF Doc No. 2, Shalom Stahler aff ¶ 8) — not based on his own personal knowledge. The architect was not identified and no affidavit from the architect was submitted.
The pre-construction survey prepared by Quiver League, relied on by Petitioner as "prima facie evidence of the Adjacent Property's condition at that time" (NYSCEF Doc No. 8, license at PDF 2), is unsworn and unauthenticated. It explicitly states, "This report is property of Quiver Monitoring USA LLC. At no point can this report be used or referred to without the written consent of a senior representative of Quiver Monitoring." (NYSCEF Doc No. 32 at PDF 4.) Petitioner failed to submit written consent of Quiver Monitoring to utilize its report in support of the within application to encroach on the adjacent property. It is unknown if this firm would accede to the proposition that its report is sufficient for a court to render a judgment on whether to approve of an encroachment on the adjacent property.
More fundamentally, Petitioner has failed to rebut in writing the allegations interposed by Respondents concerning the construction activity which already took place at Petitioner's site. This Court questioned Petitioner's counsel during oral argument but was not assured by the responses, which contained hearsay replies of Petitioner as told to her. The responses by Petitioner's counsel concerned whether certain construction activities needed authorizations or notice, which would more properly be made by a licensed professional architect or engineer. The same holds true for counsel's answers to questions concerning conditions in Respondents' home which they claimed had resulted from the work performed — counsel's answer was that the conditions were pre-existing without any professional expert opinions offered in writing under oath or affirmation.
RPAPL § 881 does not mandate that a court grant access to an adjacent property for improvements or repairs to real property. Rather, a "license shall be granted by the court in an appropriate case" (RPAPL § 881 [emphasis added]). RPAPL § 881 is not to be construed as requiring the court to rubberstamp encroachments upon adjoining property. "[U]utter failure to show facts making the entry necessary would require denial of any such RPAPL application" (McMullan v HRH Constr., LLC, 38 AD3d 206, 207 [1st Dept 2007]). "[A] license may be granted pursuant to RPAPL 881 'in an appropriate case upon such terms as justice requires.' Defendants' assertion on this appeal that they are 'entitle[d]' to a license under RPAPL is risible." (Id.) RPAPL 881 affords a landowner "the right to seek a license under certain circumstances (155 West 21st St. v McMullan, 61 AD3d 497, 502 [1st Dept 2009], revd on grounds that sanctions not warranted 24 NY3d 1111 [2015] [emphasis in original]); it is incorrect to argue that one is entitled to a license (see id.) Although the court in 537 West 27th St. Owners LLC v Mariners Gate, LLC (2009 NY Slip Op. 32360[U], *1) granted a license, it acknowledged that "access can be denied where rights are being disregarded."
Given that Petitioner failed to adequately rebut Respondents' contentions regarding Petitioner's pre-application construction activities resulting in damage to Respondents' home and property (detailed at length), denial of Petitioner's application is appropriate (see McMullan, 38 AD3d at 206 [encroacher "utterly failed to justify their entry onto the backyard of the subject premises in connection with their construction work on the adjacent property, and repeated interference with plaintiffs' use and enjoyment of the premises by, inter alia, leaving thereon construction materials and debris, removing fences, obstructing an exit from plaintiffs' apartment and bolting closed the fire exit, for which they were issued a violation by the Department of Buildings, and causing damage to plaintiffs' apartment itself as well as the backyard"]).
Normally, the Court would hold an evidentiary hearing to resolve the subject dispute (see Matter of Thomas Anthony Holdings LLC, 216 AD3d at 540). Here, however, Petitioner has not made out even a prima facie case of entitlement to encroachment, based on the lack of admissible evidence to support its application, as discussed above. On the contrary, the admissible written record evidence evidences that Petitioner displayed a cavalier attitude toward its neighbors at 383 Hawthorne Street by performing construction work which damaged Respondents' home, leaving unsafe debris on it, trespassing, and destroying outside appurtenances; working outside normal hours; and offering a license that would prohibit Respondents from reporting violations to the authorities without offering Petitioner an opportunity first to cure, and permitting Petitioner to utilize law enforcement to enter Respondents' home.
With respect to interference with Respondent Michael Pesca's livelihood as a podcast creator, while the Court does not decide the issue of whether he should be compensated for having to rent a recording studio outside his home due to construction noise, it notes that causing cracks and vibration to his home would impact the ability to record. In that sense, his livelihood is relevant to this analysis. In effect, Mr. Pesca would be constructively evicted from working at home.
Moreover, Petitioner has failed to supply admissible evidence — from someone with personal knowledge — as to "the nature and extent of the requested access, the duration of the access[[FN2]
], the needed protections for the adjoining property, the lack of an alternative means to perform the work, the public interest in the completion of the project[[FN3] ], and the measures in place to ensure the financial compensation of the adjoining owner for any damage or inconvenience resulting from the intrusion[[FN4]
]" (Matter of Queens Theater Owner, LLC, 192 AD3d at 690-691). No engineer's affidavit was submitted (see id.). An unauthorized and incomplete pre-construction survey was submitted. In balancing the potential hardship to the applicant if the petition is not granted against the inconvenience to the adjoining owner if it is granted (see id.), this Court finds that the inconvenience to Respondents outweighs the hardship [*8]to the Petitioner, who has demonstrated that it cannot construct its building in a safe and responsible manner. This is not to say that a building can never be constructed on the site of 379 Hawthorne Street. It just cannot be constructed by one who evidenced a disregard for the rights of the adjacent property dwellers to enjoy ownership of and residency in their property, and perhaps it can be shorter than five stories so as to minimize the degree and duration of the encroachment on the adjacent property owners and concomitant inconvenience to them. Petitioner is not without remedy. It can sell the property to someone else who would be more responsible when performing construction in a tight space on a block of attached homes.
Accordingly, it is ORDERED AND ADJUDGED that the within petition pursuant to RPAPL § 881 is DENIED and the proceeding is dismissed. The County Clerk shall enter judgment to that effect for Respondents MICHELLE HUNTER and MICHAEL PESCA, residing at 383 Hawthorne Street, Brooklyn, New York 11225, against Petitioner 379 HAWTHORNE LLC, with a business address of 11 Lawrence Avenue, Brooklyn, New York 11230.
E N T E R
HON. AARON D. MASLOW
Justice of the Supreme Court of the State of New York

Footnotes

Footnote 1:The Court suspects that Petitioner used the term "homeless shelter" in a pejorative sense. Of course, there is nothing inappropriate in constructing a homeless shelter. Nothing negative is ascribed to this statement of Petitioner. On the other hand, the Court does take into account Petitioner's umbrage at Respondents' reporting Petitioner to the Department of Buildings, which, in turn, issued violation notices. Every property owner has the right, if not the obligation, to alert the authorities of construction activity which endangers them or others. That Petitioner would assert contacting the Department of Buildings as problematic on Respondents' part is but one of the many factors the Court has taken into consideration in determining the subject application.

Footnote 2:The Court was unable to locate a definitive statement by someone with personal knowledge concerning when the project would conclude. The proposed license did provide for "a License Fee of Two Thousand ($2,000) per month as consideration for the access and license granted pursuant to this Agreement for the first twelve months. The fee shall be increased to the sum of Two Thousand Five Hundred ($2,500) per month for month 13-18 and Three Thousand ($3,000) per month thereafter. (NYSCEF Doc No. 8, license at PDF 13.) This tends to indicate that the project would last at least 18 months, yet there is no projected completion date. Surely the Court should be apprised of the completion date in order to determine whether to approve the application to encroach.

Footnote 3:There exists a public interest generally in increased housing availability in New York City; this is well known. However, the suitability of a five-story project amidst a block of attached homes was not discussed in Petitioner's papers.

Footnote 4:While Petitioner references liability insurance it has not acknowledged that it already caused damage to Respondents' property; rather counsel denied this.